**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 2:06-cr-0210-LDG-LRL |
| v. ) | |
| ) | Motion to Suppress (#465) |
| JOHNNY MIZE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## REPORT & RECOMMENDATION

The defendant, Johnny Mize, is under indictment on one count each of Conspiracy, 18 U.S.C. § 371, Production of False Identification Documents, 18 U.S.C. § 1028(a)(1), Possession and Transfer of Five or More False Identification Documents, 18 U.S.C. § 1028(a)(3), Identity Theft, 18 U.S.C. § 1028(a)(7), Bank Fraud, 18 U.S.C. § 1344, and Aggravated Identity Theft, 18 U.S.C. § 1028A. He has filed a Motion to Suppress Statement (#465), contending that the admissions he made to law enforcement officials should be suppressed at trial because they were made involuntarily, and because their probative value would be substantially outweighed by the likelihood that they would mislead the jury, confuse the issues, and cause unfair prejudice. Mize also argues that the written transcript of the recorded interview should be suppressed because it is not the "best evidence" of the interview. The government filed an Opposition (#470), and Mize filed a Reply (#480).

An evidentiary hearing was conducted on October 15, 2007. At the hearing, Special Agent Michael Adams of the United States Secret Service testified for the government. Mize testified on his own behalf. Having considered the motion, opposition, reply, and the testimony

and other evidence offered at the hearing, the undersigned Magistrate Judge submits this Report and Recommendation.

## THE FACTS

The court finds that the following facts have been established by a preponderance of the evidence. On January 25, 2006, Mize was arrested by state authorities in Utah for possession of a controlled substance and multiple counterfeit checks. He was formally charged in a 30-count criminal information. After being released on five thousand dollars bail, Mize returned to Las Vegas and was arrested here on outstanding state warrants. On March 14, 2006, while in state custody pending resolution of those warrants, Mize asked to speak with law enforcement officers.

Agent Adams and Detective Jason Kuzik of the Las Vegas Metropolitan Police Department, who was Adam's partner on the Southwestern Identity Theft and Fraud Task Force, responded to the Clark County Detention Center where Mize was being held. They had searched his house approximately a year earlier during the course of an identity theft investigation, and were aware of Mize's extensive criminal history. The three men met in a ten-by twelve-foot interview room. Adams and Kuzik reintroduced themselves and told Mize their conversation would be tape recorded. After Kuzik turned on the recorder and told Mize the tape was running,[1] Adams informed Mize of his *Miranda* rights, which Mize understood and waived.

Mize was unrestrained and free to move about inside the interview room. Neither Agent Adams nor Detective Kuzik was armed. Mize appeared relaxed and calm. By choice, he stood during most of the 45 minute interview. He was talkative, and obviously familiar with the criminal justice system. He did not appear to be afraid of or intimidated by the agents, showed no sign of duress, and at no time asked for an attorney.

---

[1] Government's Exhibit 1 is a CD recording of the interview. The court has carefully listened to the entire recording.

When asked what he wanted to talk about, Mize said, "Well, I -- yeah, if you could guarantee me get out from all the state charges, go do fed time, well, I'm going to face probably the rest of my life here."  Transcript of Interview, attached as an Exhibit to Mize's Motion (#465) at 2 (hereafter, *e.g.*, TI at 2).  He complained about an attorney who had represented him poorly, and about whom he was willing to provide incriminating information if the agents would help secure his release from custody and fold the pending Utah state charges and the potential Nevada federal charges into one case.  Agent Adams responded:

> [O]bviously, you know we can't guarantee anything.  So like what you're looking for, I won't say the first person that's ever asked me to wrap all of his charges.  That's kind of the way it works with us, that is true, you know, and get your state charges dismissed, it all gets wrapped in one ... case.  The — but what they're [the federal prosecutors] going to want is like, you know, are you willing to cooperate with us in other things, too? . . . Like are you willing to give shit up on other people, or you only want to give yourself up?

TI at 10.  Mize suggested he could help the agents if they released him from custody and followed him as he conducted his criminal activities.  Adams responded:

> Let's talk about like what, who's doing what?  Like what do you — what do you know that would be worth something to us? ... Let's start with that.

TI at 11.  Mize responded:

> The big — okay.  I — I would say the whole organized crime thing.  I got three ballers that I've worked with that I mean run this whole —  ... We're talking about to chop shops to f---ing they run — make IDs to run this whole strip.  I know the whole thing.  I know how — on the Internet, how to make — get all the everything, to —

TI at 11.  Adams interrupted, "Well — well, give me some names."  Mize responded, "I — I can't do all that.  I'm not, you know (incomprehensible), you know, I mean."  To which Adams responded:

> Well, see, and that's what I can't guarantee — because I've got to go to U.S. attorneys with something, which I'm hoping you're going to give me something I — I recognize that I can say, okay, well, I know this is true....

3

TI at 11.  Mize offered to talk about a drug transaction, but Agent Adams told him their investigative interests were in "paper," *i.e.*, credit card fraud and identity theft, not drug trafficking.  TI at 12.  Mize said he had knowledge of the "paper" and the false IDs people make, and the "machines" that are used.  He also said the merchandise that's purchased fraudulently is sold to a couple of fences, who in turn sell it on eBay, which is "big-time shit, man."  TI at 13.  Adams asked, "Well, who are the fences?"

| | | |
|---|---|---|
| Mize: | I mean I can't, you know — |
| Adams: | You can't even give me a name, dude?  How am I going — |
| Mize: | I can — I can — |
| Adams: | — to know — how am I going to know if you're bullshitting me then? |
| Mize: | Well, I mean I don't know.  I thought maybe — |
| Kuzik: | This is where the trust is going to be.  All right? |
| Mize: | I thought maybe you — |
| Kuzik: | 'Cause we're not going to — Johnny, we're not going to f--k you over.  All right?  Like I said, you give us one name, one scenario that's maybe – |

* * *

| | |
|---|---|
| Mize: | See, now, f--k, I'm not a rat.  I just think maybe you can get me out on the streets and follow me around for a minute and you'd have everything you want. |
| Kuzik: | It doesn't work like that.  'Cause the problem, John, we got to worry about is you starting the pipe again — and you're no good to us. |

* * *

| | |
|---|---|
| Adams: | It doesn't work with us just like putting you on the street.  That — that's TV shit. |
| Kuzik: | Let's do scenarios.  Okay.  You said two fences and a lawyer. |
| Mize: | Yeah. |
| Kuzik: | Okay.  Then just give us — |
| Mize: | One's like a eBay — |

4

TI at 13-16. Detective Kuzik asked Mize how the scheme works. Mize responded:

> I get the most expensive — whatever's little and most expensive. So go to Home Depot and get a thousand-dollar water heater. That's $500 bucks. So if I get 12, $15,000 of credit, I'm buying all the water heaters they got because that's $500 a shot right there, cash, cash, cash. Okay. There's one — that's one scenario. Then there's a scenario running up and down the Strip with — with credit, too. There's a whole different thing on that.

TI at 16-17.

The agents asked Mize whether he knew who had stolen a certain laptop computer from the Nevada Department of Motor Vehicles. Mize denied that he had stolen it, though he did acknowledge that a lot of his associates thought he had done it. He said he had tried to find the computer, but had been unable to do so. Then came the following exchange:

| | | |
|---|---|---|
| Mize: | | That's it, I guess — well, I guess I can't help you guys. I thought maybe — |
| Kuzik: | | Well, we think you can, but it's just — |
| Mize: | | Oh, I got some — |
| Kuzik: | | — we — don't have the authority to walk in here and just give you a get-out-of-jail-free card. |
| Mize: | | Well, you know — you know, I was not — |
| Kuzik: | | Okay. Well, once again — |
| Mize: | | I'm not even trying — |
| Kuzik: | | Let's — let's try your fences again. How did you come into 'em? |
| Mize: | | I go through one guy that's the — the main player in the whole — this whole situation. |
| Kuzik: | | Okay. If I threw a name out, would you be able to say yes or no? |
| Mize: | | And then what, I'm still stuck here with, you know, state — |
| Adams: | | Well, dude, I mean you got to — |
| Kuzik: | | For today, yes. |

5

| | | |
|---|---|---|
| Adams: | | Yeah. |
| Kuzik: | | We can't just call the phone, announce, say look, he's walking in half an hour. You know, we got to go back and lay it all out, say look, this is what the man can give us, he wants to work, what can we give him in exchange. |
| Mize: | | Okay. |

TI at 24-25.

Agent Adams produced a number of photographs of individuals who were thought to be involved in credit card fraud. He asked Mize to give him the names of as many of these individuals as he could. He told Mize that doing so was "not going to come back on you because it's just — I mean you can — nobody's going to know that you gave 'em up. I'm just looking for who's who." TI at 27. Mize pointed to a photo and said, "That's the main player right there." Adams asked for the individual's name. Mize responded, "That's the main dude right there." TI at 28. Detective Kuzik said, "Well, if you can give us a name on that player, . . . [i]t doesn't come back on you as far as the street goes. It gives you huge credit with U.S. attorneys." Mize said, "I'm going to do my time. I don't give a f--k, but I — I don't want to be a rat. I want to go up there and just do my shit . . . ." TI at 29.

| | | |
|---|---|---|
| Adams: | | Yeah, I — but I — there's nothing we can really — there's nothing we can do. |
| Kuzik: | | It's kind of a game of chicken now; who's going to blink, the U.S. attorneys or you. |
| Mize: | | No, I know. I — you know what, I mean I'm just — you know, I can get that attorney and get this shit in writing if I give you that name, I can get — go see my kids for a minute, go do fed time and shit or what? |
| | | * * * |
| Adams: | | I'll be honest with ya. Okay? You're a 7-time convicted felon ... All right? Now it's not always a situation where they're going to put you out on the street, but that doesn't mean that you still can't get credit for helping us. Okay? So sometimes it's as simple as you just giving information, which it doesn't even really f--king hurt ya because you're sitting in here. Nobody's going to figure anything. You know, and going through here and giving me names and stuff like that, it's shit that I could get my own way if I wanted to sit down with the computer and do it. . . . |

6

TI at 30-31.

| | | |
|---|---|---|
| Mize: | | I'm straight-up. I'm not a rat and I'm not going to be a rat — because I just want to take care of that lawyer and shit and that, you know — |
| Adams: | | Well, and that's — dude, I'd love to do an attorney, be honest with ya, but I can't do it without — I can't just put you back on the street.  It — it won't happen.  It's not — not even for me not wanting to.  It's more that they're going to look at your sheet and they're going to say no way.  Because they're responsible if they put you on the street, and if you go out and you do something, it comes back on them.  And I don't have the manpower to follow you 24 hours....  So it kind of comes down that you have to have a little bit of trust in us.  If nothing else, kind of by law to some extent when you help somebody – everything you tell us we have to put down in writing.  That's the way it works.  So that even if when it comes down to you getting sentenced, it's on paper that you provided this information and it led down to here and these people got arrested.  If he hadn't told us, this wouldn't have happened. . . .  So you can't really not get credit for what you do because I have to write everything down. |

TI at 32-33.

Mize: Yeah. So — so I — I can't say nothing then. I'm not going to be – that's in paper. I don't want my name on paper saying shit.

Kuzik: Well, no, we mean he's referencing U.S. attorneys. They even look at it for credit.

Mize: Oh. Yeah, no — no one else can see, f--k, look at Johnny Mize (inaudible) and shit.

Kuzik: No, no.

Adams: If nothing else, a lot of times they just give people numbers. So you're cooperating witness 06 dash.

Mize: Do you guarantee all that shit?

Adams: I can't guarantee —

Mize: I don't want my name out there.

Adams: Well, your name not being in there.

Kuzik: Yeah, we guarantee that.

Adams: If I just — if nothing else, I just list it as an individual who wished to remain anonymous, but the U.S. attorney will know who you are,

7

|   |   |   |
|---|---|---|
| 1 |  | and that's the only person that really matters, and obviously, your defense lawyer knows because you're going to tell them I am the individual that wishes to remain anonymous. |
| 2 |

3  TI at 33-34.

4    Agent Adams returned to Mize's earlier request to "wrap" all the charges into one federal
5  case. Adams said he can't do that without Mize implicating himself in the scheme. Mize
6  responded, "I was going to put myself in the picture. I was willing to give it some shit that I've
7  done, all that shit, I was — that's what I was here for — confession." TI 35-36. Mize then
8  detailed some of his activities without naming the middlemen and the fence with whom he dealt.
9  TI 37-39. Mize then asked, "Is there any likelihood of now spending any time with my kids and
10  giving my cars to my kids? . . . Is that crazy?" Det. Kuzik confirmed that it was a "crazy" idea.
11  Not missing a beat, Mize asked whether the agents could help him get his $5,000 bail back from
12  the State of Utah. Det. Kuzik responded, "Well, let's go this way. I'm not saying I can't make
13  a phone call up there. If that happens then what does — what does that buy us?" TI at 40-41.

| 14 | Mize: | That buys you the name of that dude and, man, let me out of here, and then you guys can go from there. |
| 15 |
| 16 | Adams: | [L]ike I said, I don't believe in bull shitting people. So I'm probably telling you it's probably not going to happen. |
| 17 | Mize: | Can I just have my bail back in Utah? |
| 18 | Adams: | Well, that — that is something we might be able to work out. |
| 19 | Mize: | If you can get my bail back in Utah and I — I could bail out of here, man, that'd be sweet. |
| 20 |

TI at 42.[2]

| 21 |
| 22 | Kuzik: | Well, that's what we're saying — if you're willing to help us out, then you know — |
| 23 |

---

25  [2] Adams and Kuzik did call the Utah authorities. On March 27, 2006, about two weeks after the interview, the Utah state charges were dismissed without prejudice. The five thousand dollar bail Mize had paid on those charges was returned to him on April 7, 2006.

8

1            Mize:       I am.

2 TI at 44. Mize thereafter provided the name and approximate location of one of two fences who
3 sold the items on eBay, a description of the other fence's automobile, and the name of the
4 person who initially introduced him to the fences. He also provided more details regarding the
5 scheme to steal identities to obtain credit in retail stores, to purchase merchandise on credit, and
6 to sell the merchandise to fences.

## DISCUSSION

8     Mize argues that his admissions should be suppressed as evidence because (1) he
9 withdrew his consent to questioning before making admissions, and (2) his admissions were
10 rendered involuntary by the promises made to him by his interviewers. He also contends that
11 the recorded interview is inadmissible under Federal Rule of Evidence 403, and that the
12 transcript of the recording is inadmissible under Rule 1002 ("best evidence rule"). The
13 government contends that Mize at no time asserted his right to silence, and that his admissions
14 were made voluntarily. The government also argues that Mize's reliance on Rule 403 is
15 misplaced, and that the best evidence rule does not prohibit the use of the transcript as a jury
16 aid.

**I. Invocation of Right to Remain Silence**

18     Mize first contends that his admissions should be suppressed because he withdrew his
19 consent to be questioned. In effect he contends that after waiving his right to remain silent he
20 "tried to end the interview," Motion (#465) at 2, and invoked his right to remain silent when he
21 made the following comment: "That's it. I guess — well, I guess I can't help you guys. I
22 thought maybe — " TI at 24. Without considering the context in which the comment was
23 made, and viewing it charitably in the light most favorable to Mize, the comment is, at best,
24 ambiguous. It is settled law that unless the assertion of the right to remain silent is
25 unambiguous, further questioning is permissible. *See Davis v. United States*, 512 U.S. 452,
26 458-59 (1994) (held that suspect in custody must unambiguously request counsel in order to

1  invoke right to have counsel present during questioning, and that the clarity of assertion of the
2  right should be determined objectively under the circumstances from the perspective of a
3  reasonable police officer).  The same criteria apply to the right to remain silent.  *See Simmons*
4  *v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001) (employing *Davis* standard to defendant's
5  invocation of right to remain silent); *see also Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th
6  Cir. 1994) (concluding rationale of *Davis* equally applicable to the right to silence as to the right
7  to counsel —"A suspect must articulate his desire to cut off questioning with sufficient clarity
8  that a reasonable police officer in the circumstances would understand the statement to be an
9  assertion of the right to remain silent.  If the statement is ambiguous or equivocal, then the
10 police have no duty to clarify the suspect's intent, and they may proceed with the
11 interrogation.").

12      Here, the words "That's it.  I guess — well, I guess I can't help you guys.  I thought
13 maybe — " hardly amount to an unambiguous assertion that Mize no longer wishes to answer
14 questions.  Indeed, an examination of the context in which the words were uttered leads to the
15 conclusion that Mize did *not* want to end the interview.  It was Mize, after all, who initiated the
16 interview; the agents were there at his invitation.  Throughout the interview — both before and
17 after the above-referenced statement — Mize was trying to negotiate an agreement whereby he
18 would assist the agents in some way acceptable to him in return for his release from custody.
19 He had even offered to assist the agents in a quasi undercover capacity if they freed him from
20 jail.  He had also offered to describe how an identity theft ring operated.  It was clear, however,
21 that the agents were more interested in the names and activities of Mize's criminal associates.
22 As Agent Adams had said earlier in the interview, "Let's talk about like what, who's doing
23 what? Like what do you — what do you know that would be worth something to us? . . . . Let's
24 start with that."  TI at 11.  But Mize was reluctant to identify his associates.  It also was clear
25 that the agents were not amenable to helping Mize gain his release from jail.  Agent Adams had
26 said, "It — it doesn't work with us just like putting you on the street.  That — that's — that's

10

TV shit." TI at 15-16.  Fifteen minutes into the interview Mize said, "I guess — well, I guess I can't help you guys."  The following dialogue followed immediately:

> Kuzik: Well, we think you can, but it's just — we — we don't have the authority to walk in here and just give you a get-out-of-jail-free card."
>
> Mize: Well, you know — you know, I was not —
>
> Kuzik: Okay. Well, once again —
>
> Mize: I'm not even trying —
>
> Kuzik: Let's — let's try your fences again.  How did you come into 'em?
>
> Mize: I go through one guy that's the – main player in the whole — this whole situation.

TI at 24-25.  Based on the foregoing dialogue and the context in which it occurred, the court finds that by saying "That's it.  I guess . . . I can't help you guys," Mize was not terminating the interview; rather, he was simply expressing his disappointment that, at least up to that point, he'd been unable to strike a bargain for his freedom.

**II. Voluntariness of Admissions**

Mize next contends that his statements should be suppressed because they were rendered involuntary by improper inducements offered by the interviewing agents. (Mot. (#465) at 5-7.) Before a criminal defendant's statement can be used against him, the government must prove by a preponderance of evidence that it was voluntary. *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004) (citing *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981)). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Id.* at 589 (quoting *United States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir. 2002)) (other citation omitted); *see also Haynes v. Washington*, 373 U.S. 503, 513-14 (1963).  The factual inquiry focuses on (1) the conduct of law enforcement officials in creating pressure, and (2) the defendant's ability to resist that

11

pressure. *Mincey v. Arizona*, 437 U.S. 385, 399-401 (1978). Coercion by the authorities is a necessary element of this test. *Colorado v. Connelly*, 479 U.S. 157 (1986).

Statements made by a suspect in response to a promise made by law enforcement personnel are not *per se* involuntary. *United States v. Geurrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). "The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *Id.* (citation omitted); *see also Simmons*, 235 F.3d at 1133 ("Although a promise made by law enforcement is a relevant consideration, it is only one circumstance to be considered and does not render a confession involuntary per se."). For example, a promise to bring a suspect's cooperation to the attention of the prosecutor does not render a subsequent statement involuntary, even when the police also promise to recommend leniency. *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The real question is "whether the government has made it impossible for the defendant to make a *rational* choice as to whether to confess— has made it in other words impossible for him to weigh the pros and cons of confessing and go with the balance as it appears at the time." *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990) (emphasis in original).

Mize alleges that in return for his cooperation the interviewing agents promised him (1) the possibility of spending time with his children, (2) release from custody on the "subject charges," (3) assistance with a bail refund on the Utah charges, (4) assistance with his Utah charges, and (5) confidentiality concerning his cooperation, *i.e.*, that his cooperation would not be disclosed to his criminal cohorts.

Addressing each alleged promise in turn, the court finds that as a factual matter the agents did not promise that Mize could spend time with his children. When Mize asked if there was any likelihood of spending time with his children, Agent Adams merely said it was "possible," but Det. Kuzik said such an idea was "crazy." TI at 40. The same is true of the second alleged promise. Adams and Kuzik repeatedly made it clear that Mize's request for release from custody was a nonstarter: "It . . . doesn't work with us just like putting you on the

12

street"; "[W]e don't have the authority to walk in here and just give you a get-out-of-jail-free card"; "We can't just call the phone, announce, say look, he's walking in half an hour"; "Now, it's not always a situation where they're going to put you out on the street, but that doesn't mean that you still can't get credit for helping us." TI at 15, 24-25, 31.

As for Mize's request for help getting his $5,000 bail returned by the Utah authorities, Det. Kuzik told Mize that the matter was up to the judge in Utah, but that Kuzik was "not saying I can't make a phone call up there." TI at 41. Such a statement hardly constitutes a promise to do so. Even if Kuzik's statement were to be construed as a promise, it would be insufficient, standing alone, to render Mize's statements involuntary. *See United States v. Shears*, 762 F.2d 397, 403 (4th Cir. 1985) (if alleged promise of bail was made, it was a promise which did not manifestly overbear defendant's will and have a coercive effect); *see also United States v. Ferrara*, 377 F.2d 16, 17-18 (2d Cir. 1967) (a "federal agent testified he had told [defendant] 'if he cooperated with United States [Attorney] I felt sure he would get out on reduced bail,'" but court held that "the agent's comment was not the kind of inducement or promise that would, in itself, make the confession involuntary"), *cert. denied*, 419 U.S. 1033 (1967); *Fernandez-Delgado v. United States*, 368 F.2d 34, 36 (9th Cir. 1966) (customs agent's statements that he would assist defendant in obtaining bail were not "of a nature which necessarily overcame [defendant's] ability to make a voluntary [confession]").

As for the fourth alleged promise concerning the possibility of arranging for the dismissal of Mize's Utah state charges, Agent Adams did say, "I can pull that down to here and make it all one case" *if* Adams were satisfied that there is evidence that the illegal activities in Utah relate to the illegal activities in Nevada. TI at 36. He had also told Mize that he couldn't "guarantee anything." TI at 10. Hence, Adams' representations did not constitute a promise

13

that he would arrange for the dismissal of the Utah charges.[3]

The agents' last promise presents a more interesting question. The Ninth Circuit, as some of its sister circuits, has found that statements made under an assurance of confidentiality may not be used against a defendant where the assurance of confidentiality is breached. *See, e.g.*, *United States v. Harrington*, 923 F.2d 1371, 1377 (9th Cir. 1991) (holding defendant's statement was involuntary because it was made during a court-ordered mental examination and a state statute provided that such statements would remain confidential); *Pens v. Bail*, 902 F.2d 1464, 1466 (9th Cir. 1990) (during court-ordered psychiatric program, state hospital therapists assured defendant his statements would not be revealed to the courts; the use of defendant's statements by state sentencing board violated defendant's privilege against self-incrimination); *United States v. Robinson*, 439 F.2d 553, 560 (D.C. Cir. 1970) (holding involuntary a confession obtained by prison psychologist because defendant reasonably understood that his communications would remain confidential). These cases, however, are distinguishable. In each of them, the defendant had some form of assurance that his statements would not be used against him in criminal proceedings. In the case at bar, Mize was not told or otherwise assured that his statements would not be used against him. Quite to the contrary, at the outset of the interview Agent Adams advised Mize of his *Miranda* rights, and told him that anything he said could and would be used against him in court. Mize knew he'd be going to prison, and did not ask for, nor did the agents even intimate that his cooperation could result in, a reduced sentence. In return for his self-incriminating information he was bargaining principally for his release from jail for while. When he realized that that would not happen, he settled for the return of his

---

[3] Assuming that the agents' statements regarding the Utah charges were construed to be promises, those promises were kept. As noted in footnote 2, the agents called the Utah authorities, following which the charges were dismissed and Mize's bail monies were released to him. (Opp'n (#470) at 11.) Therefore, it may be said that such a promise could not have resulted in an involuntary confession. *See Shears*, 762 F.2d at 402 ("[E]ven if the alleged promise on bail was made, it was not only performed but it was a promise which manifestly did not overbear defendant's will."); *see also United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003) ("[P]romises of leniency may be coercive if they are broken or illusory.").

$5,000 Utah bail. Before he would identify his fences and middlemen, he wanted an assurance that his criminal associates would not know that it was he who implicated them. As he put it, "I don't want my name out there." TI at 34. The agents explained that by law "everything you tell us we have to put down in writing," TI at 33, but assured him that he would not be expressly identified in the reports. Only the federal prosecutors would be told that he was the source of the information. The court finds that this type of promise, viewed in light of the surrounding circumstances as set forth below, was not sufficient to overbear Mize's will.

At the time of the interview Mize was in his early 40's. He appeared to be of normal intelligence, and had some college education. He was by no means weak-minded. He had extensive contact with the criminal justice system, having been arrested on numerous occasions and having been convicted of attempted burglary, forgery, battery/domestic violence, and unlawful use of a controlled substance. *See* Attachment A to Opp'n (#470). It was Mize himself who initiated contact with the agents. The interview lasted less than an hour. Mize was calm, as were the agents, who neither threatened him in any way nor even raised their voices. *See Simmons*, 235 F.3d at 1133 (considering law enforcement officials' conduct and defendant's capacity to resist any pressure — specifically length of detention, the repetitive and prolonged nature of questioning, and the accused's age — in determining voluntariness) (citation omitted). The give and take between Mize and the agents was typical of a strong-minded suspect's attempt to obtain a favorable bargain from law enforcement agents. Equally typical was the agents unwillingness to "buy a pig in a poke," *i.e.*, to help Mize unless and until he first demonstrated the ability and willingness to provide useful information. It is clear that Mize was not only willing, but *wanted* to provide useful information so that he might obtain a benefit for himself. But he did not want his criminal associates to know that he had informed on them. When the agents assured him they would not expressly identify him in their reports as their source of information, Mize agreed to identify them. To the extent the agents had control over the proper dissemination of information received under an assurance of confidentiality, they

15

kept their word. According to the government, the affidavits containing Mize's information in support of wire intercept orders, search warrants and seizure warrants were filed under seal. Beyond the agents' control were the rules of discovery in federal criminal cases requiring the government to unseal and produce the affidavits, orders and warrants to counsel for the defendants. The critical question is whether Adams and Kuzik's assurance that they would not expressly identify Mize in their reports was "so manipulative or coercive that [it] deprived [him] of his ability to make an unconstrained, autonomous decision to confess." *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986). The court finds that the assurance of nondisclosure did not make it "impossible" for Mize to make a "*rational* choice" as to whether to identify his confederates; that is, it did not make it "impossible for him to weigh the pros and cons of confessing and go with the balance as it appear[ed] at the time." *Rutledge*, 900 F.2d at 1129. The record amply demonstrates by a preponderance of the evidence that Mize's admissions were made voluntarily.

### III. Federal Rule of Evidence 403

The court also finds Mize's Rule 403 arguments unavailing. The rule provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. A trial court has "considerable latitude in performing a Rule 403 balancing test . . . ." *Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 688 (9th Cir. 2001) (citation and quotation marks omitted).

Among Mize's Rule 403 contentions is that inaudible portions of the recording may result in confusion of issues and mislead the jury, thus rendering the recording inadmissible. (Mot. (#465) at 8.) However, evaluating a partially inaudible recording for reliability is within the trial court's discretion, and the standard by which the court makes the reliability determination is a fairly lenient one: "The district court is required to exclude a recording only if the inaudible or unintelligible portions are so substantial as to render the whole recording

16

untrustworthy." *United States v. Pope*, 132 F.3d 684, 688 (11th Cir. 1998) (citation and quotation marks omitted); *see also United States v. Greenfield*, 574 F.2d 305, 307 (5th Cir. 1978) ("Tapes are not per se inadmissible because they are partially inaudible; the issue is whether the unintelligible portions 'are so substantial as to render the recording as a whole untrustworthy.'") (citation and quotation marks omitted). This court has listened carefully to the recording, and finds it sufficiently audible to be trustworthy and therefore admissible.

In a similar vein, Mize maintains that the recording or its transcription will unduly confuse the issues or mislead the jury because the speakers often talk over or interrupt each other, making it difficult to determine what question is being answered. (Mot. (#465) at 8.) This, however, is precisely the type of situation in which a transcript is most helpful. The transcript is typically used to assist the jury in following the conversation when "the tape is of questionable clarity, or contains the voices of multiple speakers who talk over each other or speak in quick succession." *United States v. Holton*, 116 F.3d 1536, 1540 (D.C. Cir. 1997), *cert. denied*, 522 U.S. 1067 (1998). It is the risk that the jurors may "substitute the contents of the more accessible, printed dialogue for the sounds they cannot readily hear or distinguish on the tape and, in doing so, transform the transcript into independent evidence of the recorded statements," that the court must take precautions against, *id.* (citations omitted), which can be accomplished through proper instructions to the jury.

Mize also contends that since he occasionally contradicts himself during the taped interview, any attempt to clarify such contradictory responses would cause undue delay and be a waste of time, further justifying exclusion. (Mot. (#465) at 8.) This concern, however, goes to the weight that the jury will place on the evidence, not to the recording's admissibility. *See Granite Mgmt. Corp. v. Aetna Cas. & Sur. Co.*, 37 Fed. Appx. 262, 267 (9th Cir. 2002) (credibility of witnesses and weight of evidence are jury issues) (citation omitted).

. . .

. . .

### IV. Best Evidence Rule

Lastly, the court rejects Mize's claim that admission of the transcript would violate the best evidence rule. *See* Fed. R. Evid. 1002. The Ninth Circuit allows the use of government-prepared transcripts as an aid to the jury in considering tape recordings, subject to a limiting instruction that the recording is the evidence, not the transcript. *See United States v. Booker*, 952 F.2d 247, 250 (9th Cir. 1991) (holding that district court did not abuse its discretion in permitting transcripts to be used as an aid, even though it never reviewed the transcripts for accuracy). In *United States v. Pena-Espinoza*, 47 F.3d 356 (9th Cir. 1995), the court upheld admission of wiretap transcripts which had been translated from Spanish to English, even though the transcripts had not been independently verified for accuracy by the court or other witnesses. *Id.* at 360. As Pena-Espinoza made only "largely conclusory allegations of possible inaccuracy," the court concluded that the accuracy of the transcripts was never seriously disputed and that the district court therefore did not abuse its discretion in admitting them. *Id.*

As in *Pena-Espinoza*, Mize does not seriously dispute the accuracy of the transcript. He did not object to its accuracy at the evidentiary hearing, and Mize has made only "conclusory allegations" in his Motion (#465). Upon its review of the transcript, this court found very few errors. Use of the transcript as an aid to the jury in following the tape recording of the interview is proper.

### RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Mize's Motion to Suppress Statement (#465) should be denied.

DATED this 2nd day of January, 2008.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**